United States District Court

For the Northern District of California

1

2

3

4

5

6

7                         IN THE UNITED STATES DISTRICT COURT

8                      FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   DOREEN MACLELLAN,                          No. C-12-5795 MMC

11              Plaintiff,                       **ORDER GRANTING DEFENDANTS
                                                 DINIS, ALVAREZ, AND COUNTY OF
12        v.                                     ALAMEDA'S MOTION FOR SUMMARY
                                                 JUDGMENT**
13   COUNTY OF ALAMEDA, et al.,

14              Defendants.
                                        /
15

16        Before the Court is defendants County of Alameda ("the County"), Deputy Marc

17   Dinis ("Dinis"), and Deputy Rafael Alvarez's ("Alvarez") Motion for Summary Judgment,

18   filed December 20, 2013.  Plaintiff Doreen MacLellan ("MacLellan") has filed opposition to

19   the motion, to which defendants have replied.  Having read and considered the papers filed

20   in support of and in opposition to the motion, the Court rules as follows.[1]

21                                    **BACKGROUND[2]**

22        Shortly after 11:00 a.m. on October 12, 2011, the Alameda County Sheriff's Office

23

24        [1] By order filed January 28, 2014, the Court vacated the hearing on the motion
25   scheduled for January 31, 2014 and took the matter under submission.

26        [2] The facts set forth below, including the sequence in which they transpired, are
     derived from the declarations, deposition transcripts, interrogatory responses, and exhibits
27   submitted by the parties, and either are not in dispute or are "viewed in the light most
     favorable to the party opposing the motion."  See Matsushita Electric Industrial Co. v.
     Zenith Radio Corp., 475 U.S. 574, 587 (1986).  MacLellan has filed various objections to
28   the evidence submitted by defendants.  To the extent the Court has relied on any such
     evidence herein, the objections thereto are overruled.  To the extent the Court has not
     relied on such evidence, the objections are not further addressed herein.

1  received a call from Claudette Wright, the manager at a local Safeway.  (See Torchy Decl.

2  Ex. A (Dispatch Audio Recording).)  Wright reported that she had a customer outside who

3  had "kind of lost her mind."  (See id.)  Wright explained that the customer, later determined

4  to be MacLellan, was a regular who drove a Mercedes, had her two children with her at the

5  time, and "thinks everybody's after her."  (See id.)  She reported that the customer was

6  screaming at Wright's front end manager and was "not coherent."  (See id.)  Wright further

7  stated: "[The woman] wanted the president.  I don't know.  She wanted everybody out

8  there. . . . [S]he wants to call the FBI and the CIA and stuff."  (See id.)[3]  The Sheriff's Office

9  subsequently alerted Deputies Dinis, Alvarez, and Dawn Sullivan ("Sullivan") to the

10  situation, specifically (1) that Wright had reported there was a woman outside of Safeway

11  with her children; (2) that Wright thought the woman was "losing her mind" and was having

12  "psych issues"; and (3) that the woman "appear[ed] very paranoid."  (See id.)  The deputies

13  were sent to Wright's location to determine whether the woman met the criteria for an

14  involuntary hold pursuant to California Welfare and Institutions Code § 5150.  (See id.)

15        Three deputies arrived on the scene shortly after 11:20 a.m.  (See Dinis Decl. ¶ 6;

16  Alvarez Decl. ¶ 6; Sullivan Decl. ¶ 5.)  Dinis, who was the officer in charge at the scene,

17  and Sullivan approached MacLellan, who "stated that she believed that people were

18  watching her and were attempting to obtain unknown information from her."  (See Dinis

19  Decl. ¶ 7; Sullivan Decl. ¶ 6.)  The deputies found her conversation "incoherent and

20  nonsensical."  (Dinis Decl. ¶ 7; Sullivan Decl. ¶ 6.)  She also refused to give the deputies

21  her name, claiming they already knew it.  (Dinis Decl. ¶ 7; Sullivan Decl. ¶ 6.)

22        The deputies noticed that MacLellan's children were of school age but not in school.

23  (See Dinis Decl. ¶ 8; Alvarez ¶ 8; Sullivan Decl. ¶ 7.)  MacLellan told Alvarez she had taken

24  them out of school for a few days, but she refused to explain why.  (See MacLellan Ex. B at

25  4:5-7.)  One of her sons asked her to answer the deputies' questions and told her he did

26

27      [3] In her opposition, MacLellan argues that, contrary to what was reported to dispatch, she did not in fact mention the CIA, and, in addition to the president, only instructed Wright to "call the local authorities/police, the EPA, the FBI, or D.A.R.P.A."  (See

28  Opp'n 7:2-7 (citing MacLellan Ex. B (MacLellan Interrogatory Responses) at 3:3-4).)

1   not understand what she was saying.  (See Dinis Decl. ¶ 8.)  During the course of the

2   conversation, MacLellan "all of a sudden" began to walk away from the deputies with her

3   sons (see MacLellan Ex. L 26:6-11 (Dinis Depo. Tr.); see also Dinis Decl. ¶ 9), "expressing

4   concern that the boys were giving too much information to the police" (see id. ¶ 9).  Dinis

5   then noticed the older son looking back at the deputies and starting to cry.  (See id. ¶ 10.)

6   Although the boy's back was turned to Dinis and he did not see tears, he determined the

7   boy was crying based on his "[s]niffing and head down and . . . just general crying

8   behavior."  (MacLellan Ex. L (Dinis Depo. Tr.) 36:14-15.)  Dinis asked the boy "if he was

9   scared of his mother," and he said he was.  (See id.)

10      At that point, which was approximately 12:11 p.m., Dinis, based on what he had

11  observed and heard, made the determination to place MacLellan under an involuntary

12  detention hold pursuant to section 5150.  (See Dinis Decl. ¶ 11.)  Sullivan then approached

13  MacLellan from behind and placed her in handcuffs.  (See Sullivan Decl. ¶ 11.)  Although

14  the handcuffs were "very, very tight" and caused MacLellan pain (see Sazama Decl. Ex. D

15  (MacLellan Depo. Tr.) at 272:7-9), she did not inform the deputies of those circumstances

16  (see id. at 273:15-17).  Neither Dinis nor Alvarez touched MacLellan during their encounter

17  with her.  (See Dinis Decl. ¶ 13; Alvarez Decl. ¶ 11.)

18      After MacLellan was thus detained, Dinis had intended to place her in the back seat

19  of one of the police cars while they waited for the ambulance that would transport her to the

20  hospital for psychiatric evaluation (see Dinis Decl. ¶ 15), but she appeared to become

21  upset (see id.), dropped to the ground (see Sazama Decl. Ex. D (MacLellan Depo. Tr.) at

22  271:3-6),[4] and began rolling and speaking "nonsensically" (see Dinis Decl. ¶ 15).  In

23  particular, MacLellan stated she "believed some type of artificial or virtual technology [was]

24  being used, [had] been used on [her]" (see id. 555:15-17; see also MacLellan Ex. B

25  (MacLellan Interrogatory Responses) at 4:13); asked Alvarez if he had seen her driving on

26

27      [4] Later, at her deposition, MacLellan explained that she "felt this pole-like sensation,
    isolation through [her] spinal column" (see Sazama Decl. Ex. D (MacLellan Depo. Tr.) at
28  271:3-6; 272:6-9) and that she couldn't move her legs (id. at 272:12-16).

3

1  the freeway the previous day (see id. at 4:14); and expressed relief that "they" couldn't see

2  her (see Dinis Decl. ¶ 15).  Dinis attempted to read her the advisement on the 5150

3  application form, which informed her of the fact she was being placed under an involuntary

4  psychiatric hold and of where she was being taken.  (Id. ¶ 16.)  He was unable to complete

5  the advisement, however, because MacLellan did not appear to be listening to what he was

6  saying.  (Dinis Decl. ¶ 16.)  The ambulance arrived at approximately 12:20 p.m., and

7  MacLellan was delivered into the care of the ambulance personnel.  (Id. ¶ 17.)

8       MacLellan subsequently filed the instant action against Dinis, Alvarez, and the

9  County, asserting claims under 42 U.S.C. § 1983 and California Civil Code § 52.1.

10  Defendants have moved for summary judgment on all of plaintiff's claims against them.

11                              **LEGAL STANDARD**

12       Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a "court shall grant

13  summary judgment if the movant shows that there is no genuine issue as to any material

14  fact and that the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P.

15  56(a).

16       The Supreme Court's 1986 "trilogy" of Celotex Corp. v. Catrett, 477 U.S. 317 (1986),

17  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co.

18  v. Zenith Radio Corp., 475 U.S. 574 (1986), requires that a party seeking summary

19  judgment show the absence of a genuine issue of material fact.  Once the moving party has

20  done so, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or

21  by the depositions, answers to interrogatories, and admissions on file, designate specific

22  facts showing that there is a genuine issue for trial."  See Celotex, 477 U.S. at 324 (internal

23  quotation and citation omitted).  "When the moving party has carried its burden under Rule

24  56(c), its opponent must do more than simply show that there is some metaphysical doubt

25  as to the material facts."  Matsushita, 475 U.S. at 586.  "If the [opposing party's] evidence is

26  merely colorable, or is not significantly probative, summary judgment may be granted."

27  Liberty Lobby, 477 U.S. at 249-50 (citations omitted).  "[I]nferences to be drawn from the

28  underlying facts," however, "must be viewed in the light most favorable to the party

4

1  opposing the motion." See Matsushita, 475 U.S. at 587 (internal quotation and citation

2  omitted).

3  **DISCUSSION**

4  **A.      First Claim for Relief against All Defendants: 42 U.S.C. § 1983**

5  42 U.S.C. § 1983 provides a cause of action to a plaintiff when a person acting

6  under color of law deprives that plaintiff of any "rights, privileges, or immunities secured by

7  the Constitution and laws [of the United States]."  Section 1983 "is not itself a source of

8  substantive rights, but merely provides a method for vindicating federal rights elsewhere

9  conferred." Graham v. Connor, 490 U.S. 386, 393-94 (1989) (internal quotations and

10  citation omitted).  Here, in her complaint, MacLellan alleges that the deputy sheriffs, all of

11  whom are employees of the County, lacked probable cause to take her into custody under

12  section 5150, used excessive force in detaining her, and conducted an unconstitutional

13  search of her personal items.  McLellan further alleges that such acts were taken pursuant

14  to County policy, custom, pattern or practice.

15  **1.      Unconstitutional Seizure by Dinis and Alvarez**

16  MacLellan contends she was detained without probable cause.  As set forth above, it

17  is undisputed that Dinis made the decision to take MacLellan into custody pursuant to

18  California Welfare and Institutions Code § 5150.  At the time of the events at issue, section

19  5150 provided as follows:

20  When any person, as a result of mental disorder, is a danger to others, or to
   himself or herself, or gravely disabled, a peace officer . . . may, upon probable
21  cause, take, or cause to be taken, the person into custody and place him or
   her in a facility designated by the county and approved by the State
22  Department of Mental Health as a facility for 72-hour treatment and
   evaluation.
23
See Cal. Welf. & Inst. Code § 5150.
24
The lawfulness of a detention under section 5150 is measured by Fourth
25
Amendment standards.  See Maag v. Wessler, 960 F. 2d 773, 775 (9th Cir. 1992) (holding
26
seizure of suspected mentally ill person for psychiatric evaluation is "analogous to a
27
criminal arrest and must therefore be supported by probable cause").  "To constitute
28

5

1    probable cause to detain a person pursuant to section 5150, a state of facts must be known

2    to the peace officer . . . that would lead a person of ordinary care and prudence to believe,

3    or to entertain a strong suspicion, that the person detained is mentally disordered and is a

4    danger to himself or herself or is gravely disabled." People v. Triplett, 144 Cal. App. 3d

5    283, 287-88 (1983).  "[G]ravely disabled" means "[a] condition in which a person, as a

6    result of a mental disorder, is unable to provide for his or her basic personal needs for food,

7    clothing, or shelter."  See Cal. Welf. & Inst. Code § 5008(h)(1)(A).

8         A peace officer need not make a medical diagnosis; "it is sufficient if the officer, as a

9    lay person, can articulate behavioral symptoms of mental disorder, either temporary or

10   prolonged."  Triplett, 144 Cal. App. 3d at 288.  Generally, a sufficient showing can be made

11   where "a person's thought processes, as evidenced by words or actions or emotional

12   affect, are bizarre or inappropriate for the circumstances."  See id.; see,e.g., Cotterill v. SF

13   City and County, 2009 WL 3398369 at *6 (N.D. Cal. Oct. 20, 2009) (holding, where plaintiff

14   was yelling and screaming then non-responsive, plaintiff's apartment was in disarray, and

15   neighbor was concerned plaintiff was experiencing psychotic break, officers reasonably

16   determined plaintiff "was at least temporarily disordered").

17        The determination as to probable cause "must be decided on the facts and

18   circumstances presented to the officer at the time of the detention."  Triplett, 144

19   Cal. App. 3d at 288.  The question thus presented here is whether, as a matter of law, the

20   state of facts known to Dinis at the time he detained MacLellan was sufficient to cause

21   Dinis to "believe, or to entertain a strong suspicion, that [MacLellan was] mentally

22   disordered and [was] a danger to . . . herself or [wa]s gravely disabled."  See Triplett, 144

23   Cal. App. 3d at 287-88.

24        In that regard, defendants have provided undisputed evidence that Dinis, based on

25   MacLellan's "disordered, confused, and paranoid mental state" and her son's having

26   "expressed being afraid of his mother," became concerned that MacLellan "presented a

27   danger to herself and her children" (see Dinis Decl. ¶ 11), and, further, was concerned

28   about "her ability to take care of herself and her kids in her bizarre, paranoid and

6

1  disordered state of mind" (see id. ¶ 8; see also Sullivan Decl. ¶ 7 (further noting it "seemed

2  unsafe to me for her to be driving")).

3       Based on the above-discussed undisputed circumstances preceding MacLellan's

4  detention, the Court finds MacLellan has failed to raise a triable issue as to the claimed lack

5  of probable cause to detain her under section 5150.

### 2.    Excessive Force by Dinis and Alvarez

7       MacLellan contends Dinis and Alvarez, in violation of § 1983, used excessive force

8  in connection with her detention. (See Compl. ¶ 50.)  Specifically, MacLellan alleges that

9  her handcuffs were applied too tightly, causing her to experience pain and injury to her

10  wrists.  (See Opp'n 14:17-15:25.)[5]

11      Claims of excessive force that arise in the context of an arrest, investigatory stop or

12  other "seizure" of a person are analyzed under the Fourth Amendment and its

13  reasonableness standard.  Graham, 490 U.S. at 395.  The applicable standard "requires a

14  careful balancing of the nature and quality of the intrusion on the individual's Fourth

15  Amendment interests against the countervailing governmental interests at stake" and "must

16  be judged from the perspective of a reasonable officer on the scene, rather than with the

17  20/20 vision of hindsight."  Id. at 395-96 (internal citation and quotations omitted).  While

18  excessive force claims generally present questions of fact for the jury, such claims may be

19  decided as a matter of law "if the district court concludes, after resolving all factual disputes

20  in favor of the plaintiff, that the officer's use of force was objectively reasonable under the

21  circumstances."  Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994).

22      Here, it is undisputed that Sullivan, who is not a defendant in this action, applied

23  MacLellan's handcuffs.  (See, e.g., Sullivan Decl. ¶ 11.)  Where multiple officers are

24  present at a challenged law enforcement action, the liability of any such officer is

25

26      [5] In her complaint, MacLellan alleged she was "tackled" in front of her children. (See
   Compl. ¶ 18.)  At her deposition, however, she explained that she was not thrown to the
27  ground but, rather, used the word "tackled" to refer to her having been approached from
   behind prior to being handcuffed. (See Sazama Decl. Ex. D (MacLellan Depo. Tr.) 257:7-
28  259:17.)

1  "predicated on his integral participation in the alleged violation." Chuman v. Wright, 76 F.3d

2  292, 294-95 (9th Cir.1996) (internal quotation and citation omitted).  "Integral participation

3  does not require that each officer's actions themselves rise to the level of a constitutional

4  violation"; it does, however, require "some fundamental involvement in the conduct that

5  allegedly caused the violation." Blankenhorn v. City of Orange, 485 F.3d 463, 481 n.12

6  (9th Cir. 2007) (internal quotations, citations and alterations omitted) (holding, where

7  plaintiff, during arrest, was secured with "hobble restraints," officer who arrived on scene

8  after arrest was completed and officer who provided crowd control did not participate

9  integrally in application of "hobble restraints" but that officers who tackled plaintiff and

10  officer who handcuffed plaintiff did because their actions were "instrumental in officers'

11  gaining control of [plaintiff]").

12       Here, as noted, Dinis was the officer in charge at the scene; the evidence is

13  undisputed, however, that at the time MacLellan was handcuffed, Alvarez was "back some

14  distance," approximately "three to five parking stalls" behind the others (see MacLellan Ex.

15  L (Dinis Depo. Tr.) 39:15-22), and thereafter remained there, minding the children (see id.

16  at 43:22-44:10).  Under such circumstances, to the extent any constitutional violation

17  occurred based on the use of excessive force, the Court finds Dinis may be held liable but

18  not Alvarez.  The Court next turns to the question of whether defendants have shown, as a

19  matter of law, that no such violation was committed.

20       The Fourth Amendment does not prohibit an officer's use of reasonable force during

21  an arrest. See Graham, 490 U.S. at, 396 (noting "the right to make an arrest or

22  investigatory stop necessarily carries with it the right to use some degree of physical

23  coercion or threat thereof to effect it").  Where it leads to injury, however, an "abusive

24  application of handcuffs" may constitute excessive force. See, e.g., Palmer v. Sanderson,

25  9 F.3d 1433, 1436 (9th Cir. 1993) (holding, where officer "fastened [plaintiff's] handcuffs so

26  tightly around his wrist that they caused [plaintiff] pain and left bruises that lasted for

27  several weeks" and "refus[ed] to loosen the handcuffs after [plaintiff] complained of the

28  pain," officer not entitled to summary judgment on excessive force claim).  Here, MacLellan

8

1   has submitted undisputed evidence that at 6:45 p.m. on October 13, 2011, the day after the

2   above-described events, a nurse at Alameda County Medical Center, on a form Nursing

3   Assessment, documented, as to the heading "Fair/Minor wound," an "ecchymosis" on each

4   wrist and on one ankle (see MacLellan Ex. Q at 2), and that on October 14, 2013,

5   MacLellan's mother observed "[b]ruising" to the inside of MacLellan's wrists (see MacLellan

6   Ex. K (Louise MacLellan Depo. Tr.) at 161:2-9).

7          As noted above, however, it also is undisputed that MacLellan made no complaint at

8   any time during the period the handcuffs were in place (see Sazama Decl. Ex. D

9   (MacLellan Depo. Tr.) 273:5-17); additionally, defendants have offered evidence,

10  uncontradicted by MacLellan, that Sullivan "inserted a pinkie finger into the space between

11  . . . MacLellan's wrists and the handcuffs, to confirm that there was space in the cuffs for

12  her wrists to move" (see Sullivan Decl. ¶ 11), and there is no indication the procedures

13  followed were otherwise improper in any manner.  Further, there is no dispute that

14  MacLellan's handcuffs were removed once she was placed in the ambulance by the

15  paramedics (see Sazama Decl. Ex. D (MacLellan Depo. Tr.) 282:16-20), "no more than

16  approximately 24 minutes after they were applied" (see Dinis Decl. ¶ 17), and that she had

17  "[n]o visible trauma" at that time (see id. Ex. F (Wheaton Depo. Tr.) at 26:6).  Although, as

18  noted, some minor bruising was apparent in the following days, MacLellan offers no

19  evidence to support an inference that any of the deputies had any reason to believe the

20  handcuffs may have required any adjustment.

21          Under such circumstances, MacLellan has failed to submit sufficient evidence to

22  raise a triable issue as to her claim that Sullivan, Dinis, and Alvarez used excessive force in

23  connection with her detention.

24              **3.    Unconstitutional Search by Dinis and Alvarez**

25          MacLellan contends Sullivan unlawfully searched the purse she was carrying and

26  removed her car key and cellular phone.  (See Compl. ¶ 51; Opp'n 16:12–15; see also

27  MacLellan Ex. L (Dinis Depo. Tr.) 44:22-24 (describing purse as having been removed

28  "from [MacLellan's] arm").)  Under the Fourth Amendment, a search conducted without a

9

1   warrant is "per se unreasonable subject only to a few specifically established and

2   well-delineated exceptions."  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)

3   (internal quotation, citations, and alterations omitted).  The government bears the burden of

4   establishing that a warrantless search was reasonable and did not violate the Fourth

5   Amendment.  United States v. Carbajal, 956 F.2d 924, 930 (9th Cir.1992).

6          Pursuant to California law, "[a]t the time a person is taken into custody [under

7   section 5150] for evaluation, or within a reasonable time thereafter, unless a responsible

8   relative or the guardian or conservator of the person is in possession of the person's

9   personal property, the person taking him into custody shall take reasonable precautions to

10  preserve and safeguard the personal property in the possession of or on the premises

11  occupied by the person[;] [t]he person taking him into custody shall then furnish to the court

12  a report generally describing the person's property so preserved and safeguarded and its

13  disposition."  See Cal. Welf. & Inst. Code § 5156.

14         Here, defendants argue that because MacLellan was lawfully detained under section

15  5150, they were required by section 5156 to take reasonable precautions to preserve and

16  safeguard her personal property (see Mot. 15:7-9 (quoting Cal. Welf. & Inst. Code § 5156)),

17  and it is undisputed that all her property accompanied her to the hospital and was returned

18  to her when she was discharged, with the exception of one car key, which was used by her

19  father, who arrived later to take custody of the children and drive her car from the scene

20  (see Sazama Decl. Ex. D at 663:1-16; 664:2-12).  MacLellan offers no evidence that the

21  officers' handling of her purse failed to comply with section 5156.  See Triplett, 144

22  Cal. App. 3d at 289 (finding no constitutional violation based on search of detainee's purse;

23  noting officer was "complying with dictates of section 5156"); see also United States v.

24  Burnette, 698 F.2d 1038, 1049 (9th Cir. 1983) (finding no unconstitutional search where

25  purse carried by arrestee was searched incident to arrest).

26         Under such circumstances, MacLellan has failed to submit sufficient evidence to

27  raise a triable issue as to the claimed unconstitutional search.

28

10

1                              **4.       Monell Claim against Alameda County**

2          MacLellan alleges that Dinis and Alvarez acted "at all times herein knowing full well

3 that the established practices and customs of the Alameda County Sheriff's Department

4 would allow . . . the continued violation of the Fourth Amendment."  (See Compl. ¶ 54.)[6]

5          A "local governing body" can be held liable under 42 U.S.C. § 1983 "where the

6 action that is alleged to be unconstitutional implements or executes a policy statement,

7 ordinance, regulation, or decision officially adopted and promulgated by that body's

8 officers," see Monell v. Dep't of Social Servs., 436 U.S. 658, 690 (1978), or is committed

9 "pursuant to governmental custom, even though such a custom has not received formal

10 approval through the body's official decisionmaking channels," see id. at 690-91.

11 "Exoneration of [the individual officer] of the charge [against him]," however, "precludes

12 municipal liability for the alleged unconstitutional [action]."  Fairley v. Luman, 281 F.3d 913,

13 916 (9th Cir.2002); see also Quintanilla v. City of Downey, 84 F.3d 353, 356 (9th Cir.1996)

14 (holding where individual officers were found not to have deprived plaintiff of Fourth

15 Amendment rights, trial court correctly entered judgment for municipality on municipal

16 liability claim; distinguishing case where exoneration of officer was based on qualified

17 immunity).  Here, as discussed above, the Court has found MacLellan has failed to raise a

18 triable issue as to the claimed constitutional violations by any of the individual deputies.

19          Accordingly, MacLellan fails to raise a triable issue as to her Monell claim against

20 the County.

21

22

23       [6] In addition to the above-discussed claimed violation, MacLellan, citing California Welfare and Institutions Code §§ 5150.1 and 5150.2 (see Opp'n 19:27–20:11), asserts in

24 her opposition that the defendant deputies acted unlawfully pursuant to "the custom, practice, policy and procedure that allowed [her] on October 12, 2011 to be detained and transported via ambulance for an involuntary 'medical clearance,'" rather than requiring she

25 be transported by the deputies themselves (see Opp'n 22:24-23:4).  Neither of said sections dictates the procedures by which such transportations are to be accomplished.

26 See Cal. Welf. & Inst. Code § 5150.1 (precluding mental health personnel from interfering with or restricting peace officers with respect to transportation and performance of duries

27 under section 5150); Cal. Welf. & Inst. Code § 5150.2 (same), nor does MacLellan cite any authority suggesting the manner in which she was transported rises to the level of a

28 constitutional violation.

11

### B.    Fourth Claim for Relief against All Defendants: California Civil Code § 52.1

Lastly, MacLellan contends Dinis, in the course of "directing" the 5150 hold, violated California Civil Code § 52.1 by interfering with "her right to free speech, rights of liberty, to be free of unreasonable searches and seizures, right to be free from bodily harm, unreasonable deprivation of life without due process of law, deprivation of familial companionship and society, all of which are secured by the Constitution and laws of California and the United States."  (See Compl. ¶ 76-77.)

Section 52.1 provides a private right of action for damages against any person, whether acting under color of law or not, who interferes or attempts to interfere "by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws [of California]." See Cal. Civ. Code § 52.1(a)-(b); Cal. Civ. Code. § 52.1(j) (providing "speech alone is not sufficient to support" a section 52.1 action, unless the "speech itself threatens violence"); see also Jones v. Kmart Corp., 17 Cal. 4th 329, 334 (1998) (holding violation of section 52.1 requires "an attempted or completed act of interference with a legal right, accompanied by a form of coercion").  Here, MacLellan's claim under section 52.1 is based on the same conduct as is her § 1983 claim, and, as discussed above, MacLellan has failed to raise a triable issue as to any claimed violation of state or federal law by any defendant, let alone a violation involving any coercion or threat of violence.

Accordingly, MacLellan fails to raise a triable issue as to her section 52.1 claim against Dinis, Alvarez, or the County.

### CONCLUSION

For the reasons stated above, defendants Dinis, Alvarez, and the County's motion

//

//

//

12

1 │ for summary judgment is hereby GRANTED.

2 │     **IT IS SO ORDERED.**

3 │

4 │ Dated: February 26, 2014

           MAXINE M. CHESNEY

5 │            United States District Judge

6 │

7 │

8 │

9 │

10 │

11 │

12 │

13 │

14 │

15 │

16 │

17 │

18 │

19 │

20 │

21 │

22 │

23 │

24 │

25 │

26 │

27 │

28 │

13