1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DOREEN MACLELLAN,

      Plaintiff,

  v.

COUNTY OF ALAMEDA, et al.,

      Defendants.

_____/

No. C 12-5795 MMC

**ORDER GRANTING IN PART
DEFENDANT ALAMEDA COUNTY
MEDICAL CENTER'S MOTION FOR
SUMMARY JUDGMENT**

      Before the Court is defendant Alameda County Medical Center's ("ACMC") Motion for Summary Judgment or in the Alternative Partial Summary Judgment, filed December 23, 2013.  Plaintiff Doreen MacLellan ("MacLellan") has filed opposition, to which defendant has replied.  Having read and considered the papers filed in support of and in opposition to the motion, the Court rules as follows.[1]

**BACKGROUND[2]**

      On October 12, 2011, MacLellan was detained pursuant to California Welfare and Institutions Code section 5150 by Alameda County Sheriff's Deputies at a local Safeway

---

[1] By order filed January 28, 2014, the Court vacated the hearing scheduled for January 31, 2014, and took the matter under submission.

[2] The facts set forth below are derived from the declarations, deposition transcripts, interrogatory responses, and exhibits submitted by the parties, and either are not in dispute or are "viewed in the light most favorable to the party opposing the motion."  See Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

1    (see Schultz Decl. Ex. A (Dinis Depo. Tr.) at Ex. 20 at 5),[3] where she had taken her two

2    sons to "report . . . concerns" she had about changes in the "environment" (see Schultz

3    Decl. Ex. B (MacLellan Depo. Tr.) at 131:21–22; 233:20–25).  Specifically, she had

4    intended to report certain "vibrations" and increasing sound amplification she had noticed in

5    recent days (see id. 161:2–19; 179:1–13; 233:15–19), because she had "a very concerned

6    fearful feeling that something was going to happen to [her] and [her] children" (id.

7    180:9–11).  On the Application for Emergency Psychiatric Detention ("Application"), Deputy

8    Marc Dinis ("Dinis"), who detained MacLellan, described her as "believ[ing] she was in a

9    virtual reality and Mars," being "unaware of where [she and the deputies] were," and

10   "fe[eling] people were out to get her."  (See Schultz Decl. Ex. A (Dinis Depo. Tr.) at Ex. 20

11   at 5.)  Additionally, he described her two children as "scared" and that "her ten year old was

12   crying and said his mom's behavior frightened him."  (See id.)  As set forth in the

13   Application, Dinis, based on what he had observed, believed he had probable cause to

14   think MacLellan was a danger to herself and others, specifically, her children, based on a

15   mental disorder.  (See id.)

16        After she was detained, MacLellan was transported by ambulance to Valley Care

17   Medical Center ("VCMC").  Dan Wheaton ("Wheaton"), the paramedic who transported

18   MacLellan, recalls that she was "paranoid," in that she "was making statements that . . .

19   [led] [him] to believe that she felt certain people were out to harm her or that people were in

20   some way trying to manipulate her and there didn't seem to be any evidence that that was

21   the case."  (See Schultz Decl. Ex. C (Wheaton Depo. Tr.) at 26:14–19.)  Wheaton further

22   described MacLellan as "somewhat aggressive verbally" and "angry."  (See id. at

23   26:21–24.)

24        As set forth in MacLellan's medical records from VCMC, where she arrived at

25   approximately 1:00 p.m. on October 12, 2011 (see Schultz Decl. Ex. E (VCMC medical

26   

---

27   [3] MacLellan has filed objections to the evidence submitted by defendants.  To the
     extent the Court has relied on any such evidence herein, the objections thereto are
     overruled.  To the extent the Court has not relied on such evidence, the objections are not
28   further addressed herein.

2

1    records) at 3), MacLellan tested positive for amphetamines on a toxicology screen[4] and

2    believed that she was in a "virtual reality world," that she was "placed here by aliens," and

3    that "people c[ould] read her mind" (see id. at 16, 17, 22.)  As further set forth therein,

4    MacLellan stated that she "wanted to kill herself because she was in a virtual world/reality,

5    and that everything would then disappear."  (See id. at 9.)  MacLellan was placed in four-

6    point restraints at VCMC because she attempted to leave the hospital and because of her

7    "potential for harm to self or others."  (See id. at 16, 17.)

8         On October 12, 2011, at 6:34 p.m., MacLellan was transferred with her records from

9    VCMC to ACMC's John George Psychiatric Pavilion ("JGPP").  (See id. at 15–16.)  At 8:35

10   p.m at JGPP's Psychiatric Emergency Service ("PES"), David Hume, R.N. ("Hume")

11   completed a Psychiatric Emergency Service Initial Nursing Assessment ("Assessment")

12   (see MacLellan Ex. H (MacLellan letters to defendants) Ex. 14),[5] in which he described

13   MacLellan as "labile," "restless," and "disheveled," but did not check the boxes for

14   "Paranoia" and "Psychotic Symptoms."  (See id.)  MacLellan asked to contact her children

15   and parents, but was not allowed to do so at that time.  (See MacLellan Ex. H at

16   unnumbered page 5.)

17        Shortly before 9:00 p.m., MacLellan was seen by Elias Aboujaoude, M.D. ("Dr.

18   Aboujaoude"), who conducted an intake evaluation and completed an Intake Evaluation

19   form (see Schultz Decl. Ex. F (ACMC medical records) at 24), in which he described

20   MacLellan as "dysphoric," "[p]aranoid," and "[p]erseverative about police jurisdictions."

21   (See id. at 23.)  Dr. Aboujaoude further noted MacLellan was "[n]ot sure the police who

22

23        [4] MacLellan later explained to ACMC personnel that she had a prescription for
     Adderall.  (See Schultz Decl. Ex. F (ACMC medical records) at 23, 43.)
24

25        [5] In its reply, ACMC states that the "arguments, contentions, and statements" in
     MacLellan's opposition "are not supported by direct references to specific items of
26   admissible evidence."  (See Reply 2:19-23.)  To the extent ACMC intends such comment
     as an evidentiary objection, the Court notes that MacLellan's opposition, including the
27   exhibits thereto, is signed under penalty of perjury (see Opp'n 15:17-19) and thus, to the
     extent the statements therein are based on personal knowledge, serves as an affidavit, see
28   Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir. 1998) (finding genuine issue of
     material fact based on facts set forth in sworn opposition).

confronted her at Safeway were really police," was "[s]omewhat disorganized in thought processes," and was "[p]erseverative about 'timeliness' of things." (See id.)  Dr. Aboujaoude diagnosed MacLellan on the form as having "Psychotic Disorder NOS [Not Otherwise Specified]" and recommended she be observed overnight.  (See id. at 23-24.) Dr. Aboujaoude further noted on the form that she was "[a]damantly refusing medications and not meeting criteria for involuntary medication . . . at this time," and that he recommended that her "willingness to accept meds" continue to be assessed.  (See id.) Based on his evaluation, Dr. Aboujaoude did not find MacLellan was a danger to herself or others, but did determine she met section 5150's criteria for being "gravely disabled."  (See id. at 24.)

Following the intake evaluation, MacLellan remained awake much of the night in the PES unit.  (See MacLellan Ex. I (PES Nursing Progress Notes) at 2.)  At 3:10 a.m. on October 13, 2011, staff talked to her again about medication; MacLellan continued to refuse to consent to any medication.  (See id. at 1.)  At approximately 5:00 a.m., a doctor "threatened" MacLellan, telling her she needed to sleep and could therefore either take oral medication or receive an injection.  (See MacLellan Ex. H (MacLellan letters to defendants) at unnumbered pages 6-7.)  MacLellan closed her eyes and laid down but was "pulled up from [her] floor mat by three large men and one woman who forced her into a dimly lit back room," where they "laid her face down on a bed, lifted up her hospital gown and injected her against her will" with 10 mg of Zyprexa, an antipsychotic.  (See MacLellan Ex. H (MacLellan letters to defendants) at unnumbered page 7); MacLellan Ex. I (PES Nursing Progress Notes) at 2.)  Shortly thereafter, MacLellan lost consciousness.  (See MacLellan Ex. H (MacLellan letters to defendants) at unnumbered page 8.)  At some point during her stay at PES, MacLellan was also given Ativan, a tranquilizer.  (See Schultz Decl. Ex. F (ACMC medical records) at 25.)

That afternoon at 3:32 p.m., MacLellan was discharged from PES and admitted to JGPP's inpatient unit.  (See id. at 25-26.)  On MacLellan's PES Exit Disposition form, Evan Garner, M.D. ("Dr. Garner") noted that, MacLellan, after having been given Zyprexa and

Ativan in PES, was "still psychotic," that her cognitive function was characterized by "delusional content," and that she could not "rationally explain why she was brought to the hospital." (See id. at 25.) Additionally, as to "Gravely Disabled Resolution," Dr. Garner wrote: "cannot take care of herself safely in the community." (See id.) On a document titled "Admit Data Base and Nursing Assessment," completed a few hours later, Amanda Preston, R.N. ("Preston") described MacLellan as "anxious, pressured, hyperverbal, and delusional"; as Preston recorded therein, MacLellan, while denying suicidal or homicidal ideation,"has delusions of radio waves and electricity near her home," "sees spirits and feels their presence," "sees numbers in the walls, in her food, everywhere," and "feels artificial technology worlds are merging." (See MacLellan Ex. H (MacLellan letters to defendants) at Ex. 25.)

The following morning, one day before her 72-hour hold pursuant to section 5150 was set to expire, David Tomasini, M.D. ("Dr. Tomasini") conducted an intake evaluation of MacLellan and completed a Psychiatry Intake Evaluation form. (See Schultz Decl. Ex. F (ACMC medical records) at 43.) As set forth therein, although Dr. Tomasini tried to discuss with MacLellan the reasons for her detention, MacLellan was "not able to explain why she was placed on a 5150, insisting that she was 'illegally' detained by police who were 'imposters' but who were able to show her that she is living in a 'virtual reality' by 'turning it up and down.'" (See id.) As further documented by Dr. Tomasini, MacLellan said "she, as well as her children, ha[d] been aware that there ha[d] been 'frequency changes' in the electromagnetic energy' which [was] causing people, including her father, to 'look different'" (see id.), and that although MacLellan denied having auditory hallucinations, she "claim[ed] she [was] 'sensitive to energies [and] spirits'" (see id.). Based on his evaluation, Dr. Tomasini determined MacLellan was at that time "too paranoid and disorganized to formulate a realistic self-care plan." (See id. at 45.) He told MacLellan she was going to be placed on a section 5250 hold because he found her to be "gravely disabled" (see MacLellan Ex. H (MacLellan letters to defendants) at unnumbered page 13), and completed a Certification Notice to that effect (see Schultz Decl. Ex. F (ACMC medical

1  records) at 162).[6]  Dr. Tomasini also told MacLellan that her ex-husband was attempting to

2  take custody of her children, and that if she wanted to be released she should take the

3  antipsychotic medication he recommended.  (See MacLellan Ex. H (MacLellan letters to

4  defendants) at unnumbered page 14.)

5      That same day, Hargit Gill ("Gill"), a social worker at ACMC, presented MacLellan

6  with an Authorization for Disclosure of Health Information to Family, which, Dr. Tomasini

7  noted in his Psychiatry Intake Evaluation, would have allowed staff to contact her family to

8  obtain "collateral" information.  (See Schultz Decl. Ex. F (ACMC medical records) at 45.)

9  Gill told MacLellan that if she did not sign the form he "would be forced" to call Child

10  Protective Services ("CPS") (MacLellan Ex. H (MacLellan letters to defendants) at

11  unnumbered page 14), and MacLellan agreed that he "should call CPS, to make sure that

12  the children were safe since they were left all alone without a legal guardian" (see id.).

13  Later that day, a Suspected Child Abuse Report was filed by Gill with CPS.  (See

14  MacLellan Ex. F at unnumbered page 34.)

15      On October 17, 2011, Dr. Tomasini documented in MacLellan's Daily Psychiatric

16  Progress Note ("Progress Note") that a CPS worker had interviewed MacLellan and

17  "reported on [her] florid paranoid delusional system."  (See Schultz Decl. Ex. F (ACMC

18  medical records) at 68.)  The CPS worker also reported to Dr. Tomasini that she had

19  interviewed MacLellan's two sons, that MacLellan "ha[d] [the children] believing her

20  paranoid ideation," and that the children "ha[d] been taken from her and w[ould] not be

21  returned until she [got] help."  (See id.)  The CPS worker further reported to Dr. Tomasini

22  that a check of MacLellan's medicine cabinet indicated MacLellan may have been using

23

24      [6] The certification review hearing was originally scheduled for October 18, 2011.
25  (See Schultz Decl. Ex. F (ACMC medical records) at 157.)  Although the medical records
   indicate she was served with a copy of the Notice of Certification at 9:00 a.m. on
   October 15, 2011, and the staff member who served her signed a proof of service so
26  attesting, (see MacLellan Ex. F at unnumbered page 28; Ex. H at Ex. 31), MacLellan's
   Patient Rights Advocate, on the day of the hearing, requested a continuance on the ground
27  MacLellan said she had never been served (see Schultz Decl. Ex. F (ACMC medical
   records) at 67, 157.)  Consequently, her certification review hearing was continued to
28  October 21, 2011.

1   excessive amounts of Adderall.  (See id.)  Additionally, in the above-referenced Progress

2   Note, Dr. Tomasini wrote that, according to MacLellan's family, she had begun acting

3   strangely about three months before.  (See id.)  Dr. Tomasini determined MacLellan's

4   symptoms may have resulted from amphetamine abuse.  (See id.)

5          Over the next two days, Dr. Tomasini, in Daily Psychiatric Progress Notes, continued

6   to document MacLellan's delusional behavior as well as her continued insistence that she

7   was "not ill" (see id. at 66-67); he further noted that MacLellan continued to refuse

8   medications and that a capacity hearing might be required.  (See id. at 66.)  Additionally, in

9   the Progress Note for October 19, 2011, he noted that MacLellan had told staff she thought

10  the mirrors in the bathroom were two-way mirrors.  (See id. at 63.)

11         On October 21, 2011, a Certification Review Hearing was held pursuant to Welfare

12  and Institutions Code section 5254 to determine if there was probable cause to detain

13  MacLellan pursuant to Welfare and Institutions Code section 5250.  (See id. at 155-56.)

14  MacLellan was present and evidence was submitted.  (See id.)  At the conclusion of the

15  hearing, a Mental Health Hearing Officer determined there was probable cause to keep

16  MacLellan at JGPP on a fourteen-day hold due to grave disability.  (See id.)  Thereafter, on

17  October 24, 2011, a Capacity Hearing was held by a different Mental Health Hearing

18  Officer to determine whether MacLellan had the capacity to refuse medications.  (See id. at

19  158.)[7]  At the conclusion of that evidentiary hearing, the Hearing Officer found by clear and

20  convincing evidence that MacLellan did not have the capacity to weigh the risks and

21  benefits of refusing or accepting treatment with antipsychotic medication.  (See id.)

22  _____

23      [7] In her opposition, MacLellan asserts she "never participated in a Capacity
    [H]earing, nor did the Superior Court ever conduct a Capacity [H]earing."  (See Opp'n 4:13-
24  17.)  She attaches thereto, however, a document titled "Superior Court of the State of
    California[,] Alameda County[,] Capacity Hearing Record," as well as a similarly-titled
25  Certification Review Hearing Record, both stamped "Filed by Fax, Alameda County," and
    obtained by MacLellan from the Alameda County Superior Court in response to her
26  subpoena.  (See MacLellan Ex. D (Court Records) at 17-18, 20.)  Under such
    circumstances, the Court finds no genuine issue of material fact exists as to whether such
27  hearings took place.  See Scott v. Harris, 550 U.S. 372, 380 (2007) (holding that "[w]hen
    opposing parties tell two different stories, one of which is blatantly contradicted by the
28  record, so that no reasonable jury could believe it, a court should not adopt that version of
    the facts for purposes of ruling on a motion for summary judgment").

That same day, MacLellan met with Michael Wright, Ph.D. ("Dr. Wright"), a psychologist, who administered to MacLellan the Millon Clinical Multiaxial Inventory-III personality test.  (See MacLellan Ex. H (MacLellan letters to defendants) at Ex. 43.) MacLellan had "no clinical elevations worth noting," which, Dr. Wright explained, "mean[t], specifically, that [she] did not show on this test, any signs of clinical psychosis."  (See id. (emphasis in original).)  Later that day, when MacLellan refused to take 5 mg of Zyprexa by mouth, the staff injected her with the drug.  (See Opp'n 11:9-11.)

On October 24, 2011, MacLellan filed a Petition for Writ of Habeas Corpus in the Alameda County Superior Court pursuant to Welfare and Institutions Code section 5275 (see MacLellan Ex. D (Court Records) at 15-16), under which statute the court must "either release the person or order an evidentiary hearing to be held within two judicial days after the petition is filed," see Cal. Welf. & Inst. Code. section 5275.  The court ordered a hearing to be held on October 25, 2011.  (See Schultz Decl. Ex. F (ACMC medical records) at 166.) On October 25, 2011, the hospital chose not to present evidence in support of MacLellan's continued hospitalization, and MacLellan's petition was granted that same day.  (See id. at 165.)

On September 29, 2012, MacLellan filed the instant lawsuit in Alameda County Superior Court, from which the case was thereafter removed to this district.  By her complaint, MacLellan asserts, as against ACMC, six causes of action: "False Imprisonment" (Second Claim for Relief); "Battery" (Third Claim for Relief); "Violation of the Bane Act," California Civil Code section 52.1 (Fourth Claim for Relief); "Negligence" (Fifth Claim for Relief); "Intentional Infliction of Emotional Distress" ("IIED") (Sixth Claim for Relief); and "Assault" (Eighth Claim for Relief).  ACMC now moves for summary judgment on each of said claims.

**LEGAL STANDARD**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P.

56(a).

The Supreme Court's 1986 "trilogy" of <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986), <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), and <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986), requires that a party seeking summary judgment show the absence of a genuine issue of material fact.  Once the moving party has done so, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  <u>See</u> <u>Celotex</u>, 477 U.S. at 324 (internal quotation and citation omitted).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita</u>, 475 U.S. at 586.  "If the [opposing party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  <u>Liberty Lobby</u>, 477 U.S. at 249-50 (citations omitted).  "[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light most favorable to the party opposing the motion."  <u>See</u> <u>Matsushita</u>, 475 U.S. at 587 (internal quotation and citation omitted).

**DISCUSSION**

ACMC moves for summary judgment on two grounds.  First, as to MacLellan's Second, Third, Fourth, Sixth, and Eighth Claims for Relief, ACMC argues it is entitled to statutory immunity under Welfare and Institutions Code section 5278.  Second, as to MacLellan's Fifth Claim for Relief, ACMC argues MacLellan lacks sufficient evidence to prove her claim.[8]

**A.     Immunity Under Welfare and Institutions Code section 5278**

The Lanterman-Petris-Short Act ("LPS Act"), codified at Welfare and Institutions Code section 5000 <u>et seq.</u>, "governs the involuntary treatment of the mentally ill in

---

[8] There is no immunity under section 5278 "for injuries proximately caused by negligence . . . that may occur during the course of an otherwise valid detention."  <u>Jacobs v. Grossmont Hosp.</u>, 108 Cal. App. 4th 69, 74 (2003).

California."  See Jacobs v. Grossmont Hosp., 108 Cal. App. 4th 69, 74 (2003).  As provided

therein, an individual may be brought to an appropriate facility for an evaluation if there is

"probable cause to believe that the person is, as a result of mental disorder, a danger to

others, or to himself or herself, or gravely disabled."  See Cal. Welf. & Inst. Code § 5150.[9]

If the facility admits such person, he/she may be detained for up to 72 hours for treatment

and evaluation, see id. § 5151, at which time, if such person has received an evaluation

and the "professional staff of the . . . facility providing evaluation services has analyzed the

person's condition and has found the person is, as a result of mental disorder . . . , a

danger to others, or to himself or herself, or gravely disabled," the person "may be certified

for not more than 14 days of intensive treatment related to the mental disorder," see id.

§ 5250.  The determination that an individual is "gravely disabled" must be based upon

probable cause.  See Cal. Welf. & Inst. Code § 5254 (requiring certification review hearing

for 14-day detention "to determine whether or not probable cause exists to detain the

person for intensive treatment").  A person is "gravely disabled" if he or she, "as a result of

a mental disorder, is unable to provide for his or her basic personal needs for food,

clothing, or shelter," see id. § 5008(h)(1)(A), unless "responsible family, friends, or others

. . . specifically indicate in writing their willingness and ability to help," see id. § 5250(d)(2).

Pursuant to section 5278 of the LPS Act, "[i]ndividuals authorized . . . to detain a

person for 72-hour treatment and evaluation . . . or to certify a person for [14-day] intensive

treatment . . . shall not be held either criminally or civilly liable for exercising this authority in

accordance with the law."  Cal. Welf. & Inst. Code § 5278.  "Section 5278 was intended to

provide immunity for claims based on conduct that is expressly authorized by the LPS Act

but would otherwise constitute a civil or criminal wrong," including kidnapping, false

imprisonment, and battery.  See Jacobs, 108 Cal. 4th at 78.  Such immunity, which

applies both to individuals and entities who make the decision to detain, see id. at 76,

"extends only to claims based on circumstances that are inherent in an involuntary

_____

[9] All references herein to the LPS Act are to the version in effect at the time of
MacLellan's detention.  The statutes so referenced have since been amended.

1  detention pursuant to 5150 [or 5250]," <u>see</u> <u>id.</u> at 78.

2        The question thus presented as to each of the causes of action for which ACMC

3  claims immunity is whether the conduct giving rise to those causes of action was "inherent

4  in an involuntary detention" and was "in accordance with the law."  <u>See</u> Cal. Wel. & Inst.

5  Code § 5278.

6                **1.**       **Second Claim for Relief: False Imprisonment**

7        With respect to MacLellan's claim for false imprisonment, section 5278 provides

8  immunity to ACMC if it exercised its authority to detain her "in accordance with the law."

9  <u>See</u> <u>id.</u>  A decision to detain is "in accordance with the law" when "that decision is

10 supported by probable cause."  <u>See</u> <u>Jacobs</u>, 108 Cal. App. 4th at 76.  Probable cause for

11 purposes of the LPS Act requires that the person authorized to detain know of facts "that

12 would lead a person of ordinary care and prudence to believe, or to entertain a strong

13 suspicion, that the person detained is mentally disordered and is a danger to himself or

14 herself or is gravely disabled," and, in addition, that the person so authorized "be able to

15 point to specific and articulable facts which, taken together with rational inferences from

16 those facts, reasonably warrant his or her belief or suspicion."  <u>People v. Triplett</u>, 144

17 Cal.App.3d 283, 288 (1983).  "[P]robable cause means 'fair probability,' not certainty or

18 even a preponderance of the evidence," and is determined based on the totality of the

19 circumstances.  <u>See</u> <u>United States v. Gourde</u>, 440 F.3d 1065, 1069 (9th Cir. 2006) (quoting

20 <u>Illinois v. Gates</u>, 462 U.S. 213, 246 (1983)); <u>see also</u> <u>United States v. Ventresca</u>, 380 U.S.

21 102, 107-08 (1965) (noting hearsay may be used to support probable cause where there is

22 a "substantial basis for crediting the hearsay"); Cal. Welf. & Inst. Code § 5256.4(d)

23 (requiring, at certification review hearing, admission of "[a]ll evidence which is relevant to

24 establishing that the person certified is or is not as a result of mental disorder or impairment

25 . . . gravely disabled").

26       Here, MacLellan argues her detention was not supported by probable cause

27 because PES and its staff "knew" that she "had a home" and that she "could take care of

28 herself."  (<u>See</u> Opp'n 10:8–11.)  She further argues JGPP's inpatient unit's staff "was

1   aware" at the time they placed her on a section 5250 hold "that [she] had her own food,

2   shelter and clothing." (See id. at 10:16–17.)  Contrary to MacLellan's argument, however,

3   an LPS detainee's ability to secure adequate shelter, food, and clothing at the time of

4   detention is not dispositive where, under the totality of the circumstances presented, a fair

5   probability exists that such individual is, by reason of a mental disorder, presently "unable

6   to provide for his or her basic personal needs."  See Cal. Welf. & Inst. Code

7   § 5008(h)(1)(A); see, e.g., Conservatorship of Guerrero, 69 Cal. App. 4th 442, 446-47

8   (1999) (affirming jury's finding of grave disability despite LPS conservatee's living in "board-

9   and-care home" and having ability to buy own clothing; holding jury entitled to consider

10  "lack of insight into his mental condition" and unwillingness to "take his medication unless

11  required to do so").

12          Here, as described in detail above, it is undisputed that, during her stay at PES and

13  JGPP's inpatient unit, three separate physicians documented MacLellan's paranoia,

14  delusions, disorganization, and confusion, as well as her repeated denials of and lack of

15  insight into her medical condition.  (See, e.g., Schultz Decl. Ex. F (ACMC medical records)

16  at 43, 56, 63-68.)  Further, there was reason to believe she had been taking more Adderall

17  than had been prescribed, thereby causing a "sudden personality change and paranoid

18  delusional system." (See id. at 67).[10]  Based on such circumstances, a reasonable

19  determination was made, as to her detention under section 5150, that MacLellan could not

20  "take care of herself safely in the community" (see Schultz Decl. Ex. F (ACMC medical

21  records) at 25), and, as to her detention under section 5250, that MacLellan was "[c]urrently

22  . . . too paranoid and disorganized to formulate a realistic self-care plan" (see id. at 45).

23          The Court thus finds no triable issue exists as to MacLellan's claim that ACMC

24

25

26          [10] Such information, obtained from a search of MacLellan's residence by CPS, is
    properly considered at a certification review hearing.  See Conservatorship of Susan T., 8
27  Cal. 4th 1005, 1019-20 (1994) (citing Cal. Welf. & Inst. Code section 5256.4(d)) (noting
    exclusionary rule inapplicable to certification review hearing regarding 14-day certification
28  for intensive treatment).

1    lacked probable cause to find her "gravely disabled" and detain her pursuant to sections

2    5150 and 5250.  Accordingly, pursuant to section 5278, ACMC is entitled to immunity with

3    respect to MacLellan's claim of false imprisonment.

4                    **2.    Third and Eighth Claims for Relief: Battery and Assault**

5            MacLellan's battery and assault claims are based on the two injections of Zyprexa,

6    an antipsychotic, that she received, respectively, on October 13, 2011 and October 24,

7    2011.  (See Opp'n 10:25-11:13; 12:28-13:18.)  As discussed above, the Court has found no

8    triable issue exists as to the claimed lack of probable cause to detain MacLellan under

9    sections 5150 and 5250.  Consequently, as to MacLellan's claims of battery and assault,

10   ACMC is entitled to immunity under section 5278 if the conduct giving rise to those claims

11   was "inherent in" her detention.  See Jacobs, 108 Cal. App. 4th at 78.

12           With the exception of antipsychotic drugs, "there is no requirement an involuntary

13   detainee consent to administration of medication," and, consequently, the administration of

14   drugs outside of that class "d[oes] not amount in any sense to a battery, but [is] within the

15   scope of the immunity contemplated by section 5278."  See Heater v. Southwood

16   Psychiatric Ctr., 42 Cal. App. 4th 1068, 1081, 1083 (1996) (holding involuntary

17   administration of Ativan, "a tranquilizer," to individual detained under section 5150 did not

18   constitute battery).  A detained individual, however, has "the right to refuse treatment with

19   antipsychotic medication," see id. § 5325.2, unless there has been "a determination of that

20   person's incapacity to refuse the treatment, in a hearing held for that purpose," see id.

21   § 5332(b), or there is "a situation in which action to impose treatment over the person's

22   objection is immediately necessary for the preservation of life or the prevention of serious

23   bodily harm to the patient or others, and it is impracticable to first gain consent," see id.

24   § 5008(m) (defining "emergency" for purposes of Cal. Welf. Inst. Code section 5332(e)).

25           Here, at the proceedings, conducted on October 24, 2011, see Cal. Welf. & Inst.

26   Code § 5332(b), MacLellan, as noted above, was found to lack the capacity to refuse

27   antipsychotic medication (see Schultz Decl. Ex. F (ACMC medical records) at 158).

28   Consequently, the administration of Zyprexa that took place after the October 24, 2011

                                                   13

1   hearing was "expressly authorized by the LPS Act," see Jacobs, 108 Cal. App. 4th at 78,

2   and "in accordance with the law," see Cal. Welf. & Inst. Code § 5278.  ACMC's earlier

3   administration of Zyprexa on October 13, 2011, however, would have been "in accordance

4   with the law" only if an "emergency" situation had arisen "in which action to impose

5   treatment over [MacLellan's] objection [was] immediately necessary for the preservation of

6   life or the prevention of serious bodily harm to [MacLellan] or others, and it [was]

7   impracticable to first gain consent."  See Cal. Welf. & Inst. Code § 5008(m).

8          Although ACMC's records contain notations that, before MacLellan was injected on

9   October 13, 2011, she was "yell[ing]" and "non-directable" and was concerned that "people

10  [were] trying to kill [her]" (see MacLellan Ex. H (letter to defendants) at Ex. 17), ACMC

11  makes no showing, or even argument, that the challenged injection was necessary to

12  preserve MacLellan's life or to prevent serious bodily harm, and MacLellan states that at

13  the time she was injected, she had simply been sitting with her back against the wall, that

14  she was approached by a doctor who told her she "need[ed] to go to sleep" and "c[ould]

15  take something orally" or be injected, and that she was thereafter taken into a room and

16  "injected against her will" (see MacLellan Ex. H (MacLellan letters to defendants) at

17  unnumbered pages 6-7).  Consequently, with regard to the October 13, 2011 injection, the

18  Court finds ACMC has failed to show no triable issue exists as to whether such injection

19  was administered "in accordance with the law."  See Cal. Welf. & Inst. Code § 5278.

20         Accordingly, as to MacLellan's battery and assault claims, ACMC is entitled to

21  immunity under section 5278 only to the extent such claims are based on the October 24th,

22  2011 injection.

23              **3.    Sixth Claim for Relief: IIED**

24         MacLellan's IIED claim is based on her detention under the LPS Act, the inclusion in

25  her medical records of "defamatory and speculative statements that came from an

26  unidentified source," the above-discussed injections, and Gill's report to CPS.  (See Opp'n

27  12:11-26.)

28         First, in light of MacLellan's failure to raise a triable issue as to the claimed lack of

                                              14

1   probable cause for her detention, ACMC is entitled to immunity to the extent MacLellan's

2   IIED claim is based on conduct "inherent in" that detention.  See Jacobs, 108 Cal. App. 4th

3   at 78.

4          Second, the practice of keeping medical charts is "inherent in an involuntary

5   detention," and the inclusion of information in such charts that may constitute hearsay or

6   that otherwise may not be admissible under the rules of evidence is expressly

7   contemplated by the LPS Act, which provides that "[a]ll evidence that is relevant" to a

8   determination of whether an individual is gravely disabled may be considered for the

9   purpose of establishing probable cause to detain.  See Cal. Welf. & Inst. Code § 5256.4(d).

10  Consequently, the Court finds no triable issue exists as to whether ACMC's medical

11  records were kept "in accordance with the law."  See id. § 5278.

12         Next, with regard to the subject injections, although, as discussed above, no triable

13  issue exists with regard to whether the second of the two was "in accordance with the law,"

14  a triable issue does exist as to the first.  See id.

15         Lastly, with regard to Gill's report to CPS, ACMC has pointed to no provision of the

16  LPS Act addressing reports of child abuse or neglect, nor has it offered any evidence or

17  made any argument that such reporting is "inherent in an involuntary detention."  See

18  Jacobs, 108 Cal. App. 4th at 78 (noting section 5278 "was intended to provide immunity for

19  claims based on conduct that is expressly authorized by the LPS Act").  Absent any such

20  evidence, the Court finds ACMC has failed to show no triable issue exists as to whether

21  Gill's report to CPS was "in accordance with the law."[11]

22         Accordingly, as to MacLellan's IIED claim, ACMC is entitled to immunity under

23  section 5278 only to the extent such claim is based on the detention, the medical records,

24  and the October 24th, 2011 injection.

25

26         [11] The Court notes that, under California Penal Code section 11172, "mandated
    reporter[s]" of child abuse or neglect are immune for "any report required or authorized by
27  this article."  See Cal. Penal Code § 11172.  Because defendant offers no evidence that Gill
    was a mandated reporter and does not rely on section 11172 in its motion, the Court does
28  not address its possible applicability.

15

1

### 4.   Fourth Claim for Relief: Violation of California Civil Code section 52.1

California Civil Code section 52.1 provides a private right of action for damages against any person, "whether or not acting under color of law," who "interferes" or "attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws [of California]."  Cal. Civ. Code § 52.1(a)-(b).  "[T]o state a cause of action under section 52.1 there must first be violence or intimidation by threat of violence."  See Cabesuela v. Browning-Ferris Indus. Of Cal., Inc., 68 Cal. App. 4th 101, 111 (1998); Cal. Civ. Code. § 52.1(j) (providing "speech alone is not sufficient to support" a section 52.1 action, unless the "speech itself threatens violence").

MacLellan's claim under Civil Code section 52.1 is based on the same conduct as that on which she bases her other state law claims, and, for the reasons discussed above, ACMC is entitled to immunity to the extent the conduct giving rise to such claim was inherent in her detention.  As set forth above, the only alleged acts involving violence or a threat of violence are the two Zyprexa injections, and the Court has found a triable issue exists as to whether the October 13, 2011 Zyprexa injection was administered "in accordance with the law."  See Cal. Welf. & Inst. Code § 5278.

Accordingly, as to MacLellan's section 52.1 claim, ACMC is entitled to immunity only to the extent such claim is based on the October 24, 2011 injection.

### B.   Negligence

MacLellan's negligence claim is based on the allegation that ACMC "negligently supervised and trained [its] staff," that, as a result, MacLellan received substandard care during the time she was a patient there, and that ACMC is vicariously liable for said substandard care.  (See Compl. ¶¶ 82-87; see also Opp'n 11:27-12:8.)  In essence, MacLellan contends she was negligently diagnosed.

Negligence is conduct which "falls below the standard [of care] established by law

16

for the protection of others against unreasonable risk of harm." Flowers v. Torrance Mem'l Hosp. Med. Ctr., 8 Cal. 4th 992, 997 (1994) (internal quotation and citation omitted).  Under California law, when the plaintiff claims negligence in the medical context, unless the conduct at issue is "within the common knowledge of the layman," id. at 1001 (internal quotation and citation omitted), the plaintiff must present evidence from an expert that the defendant breached his or her duty to the plaintiff and that the breach caused the injury to the plaintiff," Powell v. Kleinman, 151 Cal. App. 4th 112, 123, 59 Cal. Rptr. 3d 618, 626 (2007).

ACMC argues MacLellan cannot raise a triable issue of fact with respect to her negligence claim because MacLellan has disclosed no expert evidence to show ACMC has breached the relevant standard of care and the deadlines for expert disclosures and discovery have long passed.  With two exceptions, discussed below, the Court agrees. Consequently, other than those exceptions, to the extent MacLellan's negligence claim is based on decisions made by ACMC's staff with regard to her diagnosis and resulting detention, her medical treatment while detained, and the medical records kept in connection with that treatment, MacLellan fails to raise a triable issue of fact.  See Powell, 151 Cal. App. 4th at 123; see also Flowers, 8 Cal. 4th at 997 (citing as "classic example" of circumstances within common knowledge of layman and under which no expert testimony is required, "x-ray revealing a scalpel left in the patient's body following surgery").  The Court next turns to the two exceptions.

The first exception is the October 13, 2011 Zyprexa injection.  Under the doctrine of negligence per se, the "failure of a person to exercise due care is presumed" where "(1) [h]e violated a statute, ordinance, or regulation of a public entity; (2) [t]he violation proximately caused death or injury to person or property; (3) [t]he death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and (4) [t]he person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted."  Cal. Welf. & Inst. Code. § 669.  As discussed above, absent a hearing and

17

1   finding of incapacity to refuse medication, a patient has a right to refuse antipsychotic

2   medication unless the facility demonstrates an immediate need for such medication in order

3   to preserve life or prevent serious injury, see Cal. Welf. & Inst. Code §§ 5332(b), 5008(m),

4   and, as further discussed above, ACMC has failed to show such "emergency," see id.

5   § 5008(m), existed at the time the first Zyprexa injection was given.  Although ACMC had

6   submitted a report from Rona Hu, M.D. ("Dr. Hu"), a qualified medical expert, Dr. Hu's

7   opinion therein that ACMC at all times "complied with the applicable standard of care and

8   did not cause any injuries or damages" to MacLellan, (see Schultz Decl. Ex. J (Hu Report)

9   at 1), is based on entries in medical records, and, as noted above, those entries are

10  disputed by MacLellan to the extent they contain the circumstances under which she

11  received the October 13, 2011 Zyprexa injection.[12]  Consequently, ACMC has failed to

12  show no triable issue exists as to whether ACMC was negligent in injecting MacLellan with

13  Zyprexa on October 13, 2011.

14       Second, MacLellan contends Gill was negligent because he "reported [her] for child

15  abuse based on speculation and hearsay that was written on the application for emergency

16  psychiatric detention by . . . Dinis."  (See Opp'n 9:12-14.)  Gill's decision to report

17  MacLellan was not a medical decision.[13]  Rather, the filing of written reports concerning

18  child abuse and neglect is governed by the Child Abuse and Neglect Reporting Act.  See

19  Cal. Penal Code § 11164 et seq.  As noted above, ACMC has made no showing that the

20  subject report falls within the protections provided thereunder.  See Cal. Penal Code

21  § 11165.7.  Consequently, ACMC has failed to show no triable issue of fact exists as to

22  whether Gill's report to CPS was negligently made.

23       Accordingly, as to MacLellan's negligence claim, ACMC is entitled to summary

24  judgment only to the extent such claim is not based on the October 13, 2011 Zyprexa

25

26       [12] In her opposition, MacLellan objects to Dr. Hu's report on the ground it is not a
    sworn statement.  In its reply, ACMC has attached Dr. Hu's declaration under penalty of
27  perjury, attesting to the truth of the opinions contained in her report.  Under such
    circumstances, MacLellan's objection is overruled.

28       [13]  Indeed, Dr. Hu offers no comment as to the propriety of any such report.

18

injection and the CPS report.

## CONCLUSION

For the reasons stated above, defendant ACMC's motion for summary judgment is hereby GRANTED in part and DENIED in part, as follows:

1. To the extent plaintiff's causes of action for battery, assault, IIED, section 52.1, and negligence are based on the October 13, 2011 Zyprexa injection, the motion is DENIED, and to the extent plaintiff's causes of action for IIED and negligence are based on the report to CPS, the motion likewise is DENIED.

2. In all other respects, the motion is GRANTED.

**IT IS SO ORDERED.**

Dated: March 5, 2014

MAXINE M. CHESNEY
United States District Judge